UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:

Lewis A. Johnson,                                    Case No. 07-53192
                                                     Chapter 13
                    Debtor.                          Hon. Phillip J. Shefferly
_____/

**OPINION SUSTAINING DEBTOR'S AMENDED OBJECTION
TO WASHINGTON MUTUAL BANK'S PROOF OF CLAIM**


I.
Introduction

This opinion addresses an objection to a proof of claim filed by a mortgage creditor in a

Chapter 13 case. The dispute before the Court centers on the application of § 2609(b) of the Real

Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2609(b), to the arrearage portion of the

proof of claim. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a

core proceeding under 28 U.S.C. § 157(b)(2)(B). For the reasons set forth in this opinion, the Court

sustains the Debtor's amended objection.

II.
Procedural History

On July 9, 2007, the Debtor filed this Chapter 13 case. The Debtor's schedule D lists a

mortgage on the Debtor's residence at 15857 Saratoga, Detroit, Michigan, held by Washington

Mutual Bank. On September 26, 2007, Washington Mutual filed a proof of claim in the amount of

$111,374.70. Attached to the proof of claim is a worksheet that shows that the claim includes an

arrearage in the amount of $20,214.34. Also attached to the proof of claim is a copy of a mortgage

made by the Debtor on October 14, 2002 in favor of Long Beach Mortgage Company, together with a fixed/adjustable rate rider.[1]

On January 14, 2008, the Debtor filed an amended objection to Washington Mutual's proof of claim. The Debtor alleges that the arrearage is overstated and the monthly payment too high. The arrearage is based upon advances made by Washington Mutual for taxes and insurance with respect to the Debtor's residence. The Debtor argues that Washington Mutual is not entitled to recover this arrearage for two reasons.

First, the Debtor alleges that Washington Mutual failed to send the Debtor notifications required by RESPA § 2609(b) for the amounts advanced by Washington Mutual for taxes and insurance. Second, the Debtor explains that he had filed a previous Chapter 13 bankruptcy case on November 5, 2003 (case No. 03-70777), in which he confirmed a plan. That case was dismissed on April 25, 2007. To the extent that Washington Mutual made any advances during the time that the Debtor's first Chapter 13 case was pending (i.e., November 5, 2003 through April 25, 2007), the Debtor contends that Washington Mutual is now precluded from recovering such amounts because it did not provide the Debtor with a statement of the increases in the Debtor's mortgage payments caused by such advances, as required by L.B.R. 3001-2 (E.D.M.).[2] The Debtor requests that the Court allow the arrearage owing to Washington Mutual only in the amount of $6,077 rather than the

_____

[1] Washington Mutual had filed proof of claim No. 4 on July 30, 2007, indicating the same amounts owed and with the same worksheet. However, an unrelated mortgage and note were inadvertently attached. Washington Mutual withdrew that proof of claim on October 2, 2007, as having been filed in error.

[2] That rule provides as follows: "The holder of a type of claim governed by Code § 1322(b)(5) or (b)(7) shall serve the trustee, the debtor and the debtor's counsel, if any, with a statement of the increase or decrease of periodic payments prior to the effective date of the adjustment of the payment amount."

$20,214.34 asserted by Washington Mutual. In addition, Debtor asks that the Court set the ongoing monthly mortgage payment at $886.64 instead of the $1,153.51 indicated in Washington Mutual's proof of claim.

Washington Mutual states that the Debtor's objection should be overruled for three reasons. First, Washington Mutual asserts that the Debtor's mortgage was a non-escrowed loan, to which the RESPA requirements for notification regarding escrow accounts did not apply. Second, even if the Court considers the mortgage to have been an escrowed account because of the forced placed escrow created when Washington Mutual made advances for taxes and insurance for the Debtor's residence, Washington Mutual argues it was exempt from sending annual escrow account statements to the Debtor under 24 C.F.R. § 3500.17(i)(2). That paragraph excuses a lender from the annual escrow account statement requirement when the borrower "is in bankruptcy proceedings." According to Washington Mutual, that exemption applied from the time the Debtor filed his earlier Chapter 13 case on November 3, 2003, through dismissal of that case on April 25, 2007. Third, Washington Mutual argues that even if it failed to comply with L.B.R. 3001-2 in the Debtor's first bankruptcy case, such failure is of no consequence in *this* bankruptcy case because the Debtor's first bankruptcy case was dismissed instead of discharged.

On February 19, 2008, the Court held a hearing with respect to the Debtor's amended objection. At the conclusion of the hearing, the Court overruled the Debtor's objection to Washington Mutual's arrearage claim based upon the Debtor's assertion that Washington Mutual had failed to comply with L.B.R. 3001-2 in the Debtor's first bankruptcy case. The Court based its ruling on two reasons. First, the Debtor's prior bankruptcy case did not proceed to discharge but instead was dismissed for failure to make plan payments. In that circumstance, the Court held that the

-3-

alleged failure by Washington Mutual to comply with L.B.R. 3001-2 in the Debtor's first bankruptcy case did not, by itself, constitute grounds to disallow the arrearage claimed by Washington Mutual in this bankruptcy case. Second, the Court pointed out that L.B.R. 3001-2 does not provide that the remedy for failure to comply with it is a permanent bar upon collection of the amounts advanced by a mortgage company for property taxes and insurance of a debtor.

However, the Court determined to schedule an evidentiary hearing because the parties identified factual disputes regarding whether Washington Mutual sent any notifications to the Debtor advising him that it had paid property taxes and insurance, and whether the Debtor received any notifications from Washington Mutual. The Court also informed the parties that if they believed that the provisions of RESPA, including specifically its notification requirements for a lender to a borrower, apply to the Debtor's objection to Washington Mutual's claim, then the parties must each submit a memorandum addressing the application of RESPA to the Debtor's objection to Washington Mutual's arrearage claim. The Debtor and Washington Mutual each filed a memorandum and the Court held the evidentiary hearing on March 26, 2008.

III.
Evidentiary Hearing

At the evidentiary hearing, only the Debtor testified. He seemed to the Court to be honest and credible, but not well informed about the terms and obligations of his mortgage. The Debtor had difficulty answering some questions. The Court did not have the sense that the Debtor was being evasive, but rather that his memory at times failed him.

The Debtor testified that he purchased the property in 1991, financing the purchase through a different lender. According to his testimony, the Debtor paid the property taxes and insurance

-4-

under the original mortgage, although he could not remember the exact years. The Debtor refinanced the loan in October, 2002 with Long Beach Mortgage Company. The evidence is silent as to how Washington Mutual came to be the holder of the mortgage, but the Debtor has never contested Washington Mutual's rights under the mortgage. According to the Debtor, he understood that his monthly mortgage payment of $886 included an amount for taxes and insurance. The Debtor explained that he gained that understanding from an unnamed individual who prepared his "paperwork" and attended the closing of the loan.

On cross examination, the Debtor testified that he has not paid any taxes or insurance for his residence since refinancing with Washington Mutual. The Debtor admitted that he understood that if Washington Mutual paid for taxes and insurance on his residence that he would have to pay it back. The Debtor testified further that he never received any notifications from Washington Mutual regarding amounts that it paid for taxes and insurance with respect to his residence until he received a telephone call in April, 2007. That call came from a representative of Washington Mutual, who told him he was "behind in [his] payments." The Debtor was mystified as to how the amount of the default rose to over $20,000 since he had been making all of his monthly payments to the Chapter 13 Trustee until January, 2007 when he had tried to refinance his mortgage. The Debtor's understanding from the telephone call was that any default in payments related to his "house note." No mention was made by the representative of Washington Mutual as to any failure to pay taxes and insurance. The Debtor was unable to get any clarification through subsequent telephone calls to Washington Mutual.

The only document admitted into evidence at the hearing was the mortgage and note dated October 14, 2002. Paragraph 2 of the mortgage is entitled "Funds for Taxes and Insurance." It provides that the Debtor "shall pay to Lender on the day monthly payments are due under the Note

-5-

. . . a sum ('Funds')" for various items including taxes and insurance. That paragraph goes on to describe those items as "Escrow Items" and states that the lender may "collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under . . . [§ 2601 of] RESPA." Paragraph 2 further provides that "[t]he Funds shall be held in an institution whose deposits are" federally insured and states that the lender "shall apply the Funds to pay the Escrow Items." The same paragraph also has a requirement that the lender give to the borrower "an annual accounting of the Funds, showing credits and debits of the Funds and the purpose for which each debit to the Funds was made." Finally, paragraph 2 addresses surpluses and deficiencies. In the event of a surplus, the lender "shall account to the Borrower for the excess Funds . . . ." On the other hand, "[i]f the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency."

Paragraph 4 of the mortgage is entitled "Charges; Liens," and states that the "Borrower shall pay all taxes . . . in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment." Paragraph 5, entitled "Hazard or Property Insurance," contains a similar requirement for property insurance. Read in conjunction with paragraph 2, it appears that paragraphs 4 and 5 require the Debtor to pay for taxes and insurance in addition to his regularly scheduled payment of principal and interest, either by means of a payment to the lender under paragraph 2 or by direct payment of the taxes and insurance under paragraphs 4 and 5.

Paragraph 5 of the mortgage also provides that if the borrower fails to maintain insurance

coverage, the lender may "obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7." Paragraph 7, entitled "Protection of Lender's Rights in the Property," states that if the borrower fails to perform covenants contained in the mortgage, then the lender "may do and pay for whatever is necessary to protect the value of the Property." Any amounts paid by the lender under paragraph 7 "shall become additional debt of Borrower," which "shall be payable, with interest, upon notice from Lender to borrower requesting payment."

The mortgage also contains a notice provision in paragraph 14:

> Any notice to Borrower provided for in this [mortgage] shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. . . . Any notice provided for in this [mortgage] shall be deemed to have been given to Borrower . . . when given as provided in this paragraph.

IV.
Discussion

The parties differ in their interpretation of the mortgage and Washington Mutual's obligations under it. The Debtor asserts that the mortgage created an escrow account from its inception, and both the mortgage and RESPA require Washington Mutual to send notice to the Debtor of any escrow deficiencies. Because there is no evidence that Washington Mutual sent any such notice, the Debtor asserts that Washington Mutual is precluded from recovering any advances for taxes and insurance. The Debtor premises this argument on the application of § 2609(b) of RESPA and two district court decisions applying this provision. See Craig-Likely v. Wells Fargo Home Mortgage (In re Craig-Likely), No. 06-13665, 2007 U.S. Dist. LEXIS 29042 (E.D. Mich. Mar. 2, 2007); Chase Manhattan Mortgage Corp. v. Padgett, 268 B.R. 309 (S.D. Fla. 2001).

On the other hand, Washington Mutual maintains that this was not an escrowed loan, so the

-7-

provisions of RESPA regarding notifications do not apply. Even when the loan became a "forced place escrow" loan when Washington Mutual advanced the property taxes and insurance that the Debtor failed to pay, Washington Mutual contends that RESPA § 2609(b) did not apply. Further, even assuming that § 2609(b) did apply, Washington Mutual argues that there is an exemption to any notification requirements for the period of time that the Debtor was in his first bankruptcy case. Because the Debtor filed his prior Chapter 13 case on November 5, 2003, just over a year after executing the October 14, 2002 mortgage and note, and remained in bankruptcy until that case was dismissed on April 25, 2007, Washington Mutual concludes that any obligation to provide notice could not have arisen until after the prior case was dismissed.

As the claimant in this case, Washington Mutual has the burden of proof. A properly filed proof of claim "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). "[T]he burden of proof is an essential element of the claim itself; one who asserts a claim is entitled to the burden of proof that normally comes with it." Raleigh v. Illinois Dept. of Revenue, 530 U.S. 15, 21 (1951).

"During the claims allowance process, the burden of proof shifts between the parties. Initially, a creditor bears the burden of establishing its claim." In re Hughes, 313 B.R. 205, 208 (Bankr. E.D. Mich. 2004).

> If a party objects to the claim, the objecting party carries the burden of going forward with evidence to overcome the *prima facie* validity and amount of the claim. If the objecting party produces evidence to refute at least one of the allegations essential to the claim's legal sufficiency, the burden of persuasion shifts back to the claimant. The claimant ultimately bears the burden of proving the validity of the claim by a preponderance of the evidence.

Id. at 208 -09 (citations omitted).

RESPA applies to "federally related mortgage loans." Section 2602(1) of RESPA defines that term. In both the Debtor's objection and the response of Washington Mutual, the parties appear to agree that the mortgage held by Washington Mutual on the Debtor's residence is a federally related mortgage loan. The RESPA notice provision on which the Debtor relies is § 2609(b), which provides as follows:

> If the terms of any federally related mortgage loan require the borrower to make payments to the servicer (as the term is defined in section 2605(i) of this title) of the loan for deposit into an escrow account for the purpose of assuring payment of taxes, insurance premiums, and other charges with respect to the property, the servicer shall notify the borrower not less than annually of any shortage of funds in the escrow account.

12 U.S.C. § 2609(b). The annual notice requirement therefore depends on whether the mortgage requires the borrower to make payments into an escrow account.

The term "escrow account" is not defined in § 2609(b) but is defined in 24 C.F.R. 3500.17(b) as follows:

> Escrow account means any account that a servicer establishes or controls on behalf of a borrower to pay taxes, insurance premiums (including flood insurance), or other charges with respect to a federally related mortgage loan, including charges that the borrower and servicer have voluntarily agreed that the servicer should collect and pay. The definition encompasses any account established for this purpose, including a "trust account", "reserve account", "impound account", or other term in different localities. An "escrow account" includes any arrangement where the servicer adds a portion of the borrower's payments to principal and subsequently deducts from principal the disbursements for escrow account items. For purposes of this section, the term "escrow account" excludes any account that is under the borrower's total control.

Comparing the language in paragraph 2 of the mortgage to the definition in 24 C.F.R. § 3500.17(b) compels the conclusion that the Debtor's mortgage loan does contain an escrow account subject to RESPA. Paragraph 2 makes it clear that the Debtor has an obligation to pay a sum

to the lender in addition to the monthly payments of principal and interest for the purposes of paying taxes and insurance, and that the lender shall hold such funds in a deposit for the purpose of applying the funds to pay what are defined as the "Escrow Items." Despite Washington Mutual's assertion that this loan was not originally an escrowed loan, but only became an escrowed loan upon the forced placement of taxes and insurance by the lender, the Court finds that paragraph 2 of the mortgage creates an escrow account within the meaning of 24 C.F.R. § 3500.17(b) and therefore the notification provisions regarding any shortage or deficiency in the escrow account contained in § 2609(b) apply in this case.[3]

Further, the Court notes that in addition to the statutory requirement of sending a notification of a shortage in an escrow account under § 2609(b), paragraph 2 of the mortgage itself requires Washington Mutual as the lender to give the Debtor "an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made." Paragraph 2 goes on to provides that, "[i]f the amount of the funds held by [Washington Mutual] at any time is not sufficient to pay the Escrow Items when due, [Washington Mutual] may so notify [the Debtor] in writing, and, in such case [the Debtor] shall pay to [Washington Mutual] the amount necessary to make up the deficiency."

The record in this case is thin. The only documentary evidence in the record is the mortgage and the note. The only witness was the Debtor, who seemed sincere but not well informed. No

---

[3] The Court notes that RESPA § 2609(c)(1)(A) also requires an initial escrow account statement. Section 2609(c)(1)(B) requires that a lender provide the initial escrow account statement to the borrower at closing or within 45 days of the establishment of an escrow account. Under § 2609(c)(1)(C), the lender may incorporate the initial escrow account statement "in the uniform settlement statement." The parties did not address the statutory requirement regarding an initial escrow account statement, but instead addressed only the ongoing notification requirements of § 2609(b).

-10-

representative from Washington Mutual testified nor was any evidence adduced to show that Washington Mutual ever sent the Debtor a notification of any shortage or deficiency in the escrow account pursuant to § 2609(b) of RESPA or pursuant to paragraph 2 of the mortgage. The Debtor provided uncontroverted testimony that he has never received any such notification. On this record, the evidence establishes that Washington Mutual failed to comply with § 2609(b).

However, Washington Mutual contends that even if § 2609(b) did apply to it, in this instance it did not have to send any notices because it was excused from the requirements of § 2609(b). As authority, Washington Mutual relies upon 24 C.F.R. § 3500.17(i)(2). Section 3500.17(i)(2) of 24 C.F.R. does contain an exemption that applies when a borrower is in a bankruptcy case. However, on its face, the language of the exemption appears to apply not to § 2609(b), but instead to a separate provision set forth in 24 C.F.R. 3500.17(i)(1) that requires a lender to provide a borrower with an annual escrow account statement.

> No annual statements in the case of default, foreclosure, or bankruptcy. This paragraph (i)(2) contains an exemption from the provisions of § 3500.17(i)(1). If at the time the servicer conducts the escrow account analysis the borrower is more than 30 days overdue, then the servicer is exempt from the requirements of submitting an annual escrow account statement to the borrower under § 3500.17(i). This exemption also applies in situations where the servicer has brought an action for foreclosure under the underlying mortgage loan, or where the borrower is in bankruptcy proceedings.

Unlike the notification required by § 2609(b) of RESPA, the annual escrow account statement described in 24 C.F.R. 3500.17(i)(1) is not limited to a notification of any shortage in an escrow account. Although that information is included in the required contents of an annual account statement, § 3500.17(i)(1) requires much more information to be given by a lender to a borrower regarding the borrower's escrow account.

In Craig-Likely v. Wells Fargo Home Mortgage (In re Craig-Likely), No. 06-13665, 2007 U.S. Dist. LEXIS 29042 (E.D. Mich. Mar. 2, 2007), the court was faced with a similar argument and held that this exemption does not apply to excuse the requirement of § 2609(b) for the lender to notify the borrower of a shortage in an escrow account. The court in Craig-Likely explained that "although a lender does not have to send an annual escrow account statement if a borrower is in bankruptcy, the lender is not thereby relieved of the statutory duty [under § 2609(b)] 'to notify the borrower not less than annually of any shortage of funds in the escrow account.'" Id. at *10 (quoting 12 U.S.C. § 2609(b)). The Craig-Likely court explained that the duty to comply with § 2609(b) can be fulfilled by sending an annual escrow account statement or by sending "a separate document." Id. at *9-10 (citing 24 C.F.R. § 3500.17(f)(5)). The important point to the court in Craig-Likely was that, even if 24 C.F.R. § 3500.17(i)(2) creates an exemption from the requirement to send the annual escrow account statement, it does not permit the lender to "disregard[ ] completely" its duty under 12 U.S.C. § 2609(b) to advise the borrower of a shortage or delinquency in the escrow account. Id. at *10.

The Court agrees with the Craig-Likely court's analysis of these provisions. The Court accepts Washington Mutual's assertion that it was entitled to an exemption under 24 C.F.R. § 3500.17(i)(2) from the requirement contained in 24 C.F.R. § 3500.17(i)(1) to send an annual escrow account statement. But the Court also agrees with Craig-Likely that Washington Mutual still had an obligation under § 2609(b) to provide notice to the Debtor regarding any escrow account shortage or deficiency irrespective of the exemption in § 3500.17(i)(2).[4]

_____

[4] The Department of Housing and Urban Development (HUD) added the bankruptcy "exemption" to 24 C.F.R. 3500.17 in 1995. Real Estate Settlement Procedures Act, 60 Fed. Reg. 8812 (Feb. 15, 1995) (1995 WL 59305). HUD explained that it had "received a number of

The evidence demonstrates that Washington Mutual failed to comply with its duty to send a notice of a shortage in the Debtor's escrow account annually for the advances for taxes and insurance made by Washington Mutual on behalf of the Debtor. The issue then becomes what remedy, if any, does the law provide in these circumstances.

The first place to look is whether the statute confers a private cause of action for a violation. RESPA § 2609(d)(1) provides that the Secretary of Housing and Urban Development may impose penalties upon a lender who fails to comply with the requirement of the lender to send an initial escrow account statement under § 2609(c). It does not specifically address the penalties, if any, that may be imposed upon a lender who fails to comply with § 2609(b). 24 C.F.R. § 3500.17(m) also provides for penalties to be imposed by the Secretary of Housing and Urban Development upon the lender's failure to submit an initial or annual escrow statement. Neither the statute nor the regulations provide for a private cause of action by a borrower on account of the failure of the lender to comply

---

requests asking [it] to correct, clarify, or further illustrate matters contained in the final rule." Id. Generally, such changes are first published for public comment. However, HUD made the change without public comment, finding good cause for an exception from the general rule because "the corrections, clarifications, and information do not impose additional requirements, but are merely explanatory in nature or correct certain technical requirements . . . ." Id. The bankruptcy exemption appears under the "technical corrections" section with no further comment or explanation. Id. at 8815.

From the perspective of mortgagors in a Chapter 13 case, (who often file to save a home from foreclosure), this exemption creates a potentially disastrous pitfall. After making years of payments into a Chapter 13 plan, borrowers exit bankruptcy with their discharge safely in hand, only to be immediately faced with a foreclosure action. See John Rao, Fresh Look at Curing Mortgage Defaults in Chapter 13, 27 Am. Bankr. Inst. J. 14, 62 (Feb. 2008) (analyzing model Chapter 13 plan provisions addressing curing defaults, including a provision that "attempts to avoid the problem of debtors being surprised by large, catch-up bills after emerging from bankruptcy for amounts the creditor was entitled to based on escrow and interest rate changes but which were never disclosed"). As seen in this case, the exemption may also create problems for mortgagees.

-13-

with the requirements of RESPA.  Compare 12 U.S.C. § 2605(f) (governing assignments, sales and transfer of mortgage servicing, the duty to respond to borrower inquiries, the duty to timely make payments from escrow accounts, and providing that a mortgage servicer who "fails to comply with any provision of this section shall be liable to the borrower" and establishing damage amounts for individuals and class actions).

The case law on this issue is conflicting.  In Vega v. First Federal Savings & Loan Ass'n of Detroit, 622 F.3d 981 (6th Cir. 1980), Luis and Margaret Vega sued their mortgagee.  The Vegas "contend[ed] that they were required to deposit an excessive sum in an escrow account for the payment of taxes."  622 F.2d at 925.  The Vegas relied on RESPA § 2609.  In a footnote, the Sixth Circuit addressed whether that statute provided a private cause of action:

> As a threshold matter, we must determine whether the Real Estate Settlement Procedures Act creates a private cause of action for violations of 12 U.S.C. § 2609 and 12 U.S.C. § 2610.  While the Act does not expressly provide for such a causes [sic] of action, we believe, based on the legislative history, that Congress intended to create a private remedy for violations of the Act.

Id. at 925 n.8 (citing Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11 (1979) and Taylor v. Brighton Corp., 616 F.2d 256 (6th Cir. 1980)).

At the time the Sixth Circuit issued the Vega decision, the statute was limited to the substance of what now appears in § 2609(a), dealing with limits on the amount that a lender may require a borrower to deposit.  Id. at 925.  Subsections 2609(b) - (d) were not added until 1990.  See Pub. L. No. 101-625, § 942 (1990) (designating the existing text as quoted in Vega as § 2609(a) and adding subsections (b) to (d)).  Given that Congress subsequently added subsection (d), providing specifically for any enforcement action for violations of § 2609(c) to be brought by the Secretary, it is unclear whether the holding in footnote 8 of Vega still has vitality and can be applied to violations of

-14-

§ 2609(b). Other circuit courts addressing this issue have disagreed with the conclusion reached by the Sixth Circuit. See Hardy v. Regions Mortgage, Inc., 449 F.3d 1357, 1359-60 (11th Cir. 2006) (finding no private right of action for a violation of 24 C.F.R. § 3500.17(*o*) because failure to comply with that regulation "is a violation of RESPA § 10," and RESPA § 2609(d)(1) explicitly confers enforcement authority on the Secretary of Housing and urban Development); Louisiana v. Litton Mortgage Co., 50 F.3d 1298, 1300-02 (5th Cir. 1995) (finding "Congress did not intend to create a private remedy" for violations of RESPA § 2609(a)); Allison v. Liberty Savings, 695 F.2d 1086, 1088-91 (7th Cir. 1982) (considering and rejecting the Sixth Circuit's opinion in Vega and finding no private right of action under RESPA § 10 (12 U.S.C. § 2609)).

Even if the Debtor does have the right to privately pursue a cause of action for Washington Mutual's violation of § 2609(b), § 2615 of RESPA makes it clear that the provisions of RESPA do not affect the validity or enforceability of a federally related mortgage loan: "Nothing in this chapter shall affect the validity or enforceability of any . . . mortgage . . . made or arising in connection with a federally related mortgage loan." 12 U.S.C. § 2615. The failure of a lender to comply with the requirements of § 2609(b) does not somehow render the mortgage and the promises contained within it unenforceable. Paragraph 7 of the mortgage held by Washington Mutual gives it the right to protect its interest in the Debtor's residence, and any sums advanced to pay for taxes and insurance for the Debtor's property are payable by the Debtor to Washington Mutual with interest thereon. Therefore, even though the Court finds that Washington Mutual did not comply with § 2609(b) of RESPA, the Court holds that such failure does not necessarily mean that the Debtor is excused by the statute from paying back the sums advanced by Washington Mutual for the taxes and insurance on the Debtor's property as required by the mortgage.

Although not addressing the legal issue of whether a borrower may bring a private cause of action for a RESPA violation, the Debtor does cite two cases as precedent that this Court should follow in finding a basis for relief. The first case cited by the Debtor is <u>Chase Manhattan Mortgage Corp. v. Padgett</u>, 268 B.R. 309 (S.D. Fla. 2001). In <u>Padgett</u>, the debtors' confirmed plan provided for curing their mortgage arrearage over a period of forty-eight months. 268 B.R. at 311. Over a period of four years, the debtors proposed and the court approved four post-confirmation amendments to the plan. When the fifth modification was before the court for oral argument, for the first time, the lender notified the debtors that they owed additional sums because of an increase in property taxes and insurance premiums. The court approved the debtors' modification and held that because the lender failed to notify the debtors of the tax and insurance increases, the lender did not have the right to recover the past advances that the lender had made. The lender appealed. <u>Id.</u> at 312.

The district court reviewed the provisions of RESPA § 2609(b). <u>Id.</u> at 313. Although concluding that the lender was permitted to make advances for taxes and insurance without prior notice to the debtors, the court found that the lender was nevertheless obligated to notify the debtors of any escrow deficiencies resulting from tax and insurance increases. <u>Id.</u> The court also reviewed § 501.137 of the Florida Statutes, which contained an independent requirement for the lender to notify the debtors of any escrow deficiencies. <u>Id.</u> at 313-14. The district court held that the bankruptcy court did not err in finding that the lender "waived its right to recover the advances" because the lender "failed to comply with its duty to notify the mortgagor of escrow deficiencies under federal and state law." <u>Id.</u> at 314.

In the second case cited by the Debtor, <u>Craig-Likely v. Wells Fargo Home Mortgage</u> (<u>In re</u>

-16-

<u>Craig-Likely</u>), No. 06-13665, 2007 U.S. Dist. LEXIS 29042 (E.D. Mich. Mar. 2, 2007), the bankruptcy court confirmed the debtor's plan on October 10, 2002. The 48-month plan provided for the approximately $4,000 mortgage arrearage to be paid over the first 36 months. As of April 11, 2006, the mortgage arrearage had been paid in full through the plan. On that same day, the lender sent a notice that the debtor's monthly mortgage payment had increased from $998.21 to $1,347.83 over the period from June 1, 2002 to July 1, 2005. The change was due to shortages in the escrow account for insurance and taxes. As a result, the lender was alleging a $13,000 escrow shortage. The lender contended that, throughout the bankruptcy case, it sent periodic notices required under L.B.R. 3001-2. After an evidentiary hearing, the bankruptcy court found that the lender had not complied with either that rule or § 2609(b) of RESPA. Based on the lender's failure to comply with RESPA and the local bankruptcy rule, the district court held that the lender had "waived" its right to assert a claim for the tax and insurance arrearages.

Another published opinion, <u>In re Dominique</u>, 368 B.R. 913 (Bankr. S.D. Fla. 2007), adopts the reasoning of <u>Padgett</u>. The debtors in this case were in the final year of their confirmed chapter 13 plan when Countrywide provided notice for the first time of a $6,400 post-petition escrow shortage. 368 B.R. at 914-15. As in <u>Padgett</u>, the court found that Countrywide failed to provide notice as required under the mortgage, RESPA § 2609(b) and Florida state law, and that 24 C.R.F. § 3500.17(i)(2) did not excuse Countrywide's obligation to provide notice of the escrow shortage. <u>Id.</u> at 915-17. The court then addressed the consequence of that failure.

The <u>Dominique</u> court first noted that the Bankruptcy Code prohibits the use of Chapter 13 to modify the rights of the holder of a secured claim, whose "claim is secured by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). This means that,

"with respect to ongoing debt service obligations, [such a creditor's] rights cannot be altered by the chapter 13 plan. However, this does not mean such a lender's rights cannot be altered by other means." 368 B.R. at 920. Finding "the reasoning of Padgett persuasive," the Dominique court concluded that "[s]ince Countrywide did not provide notice as required by the law and by [the] Mortgage, the right to payment is waived." Id. at 921.

> Waiver of reimbursement is a logical consequence of failure to give notice, and although the consequence of waiver is not definitively stated as a remedy for a lender's failure to provide an annual escrow analysis and notice of shortfall, the holding of the Padgett court is not inconsistent with applicable law or the Mortgage.
> . . .
> > . . .
> A debtor cannot use a chapter 13 plan to alter the rights of a lender whose debt is secured solely by the debtor's primary residence. Conversely, a lender cannot hide behind a borrower's bankruptcy to avoid complying with its own obligations associated with those rights. Countrywide failed to comply with its regulatory and contractual obligations – the consequence is a waiver of its rights associated with that failure.

Id. at 921-22 (footnote omitted).

In Padgett, Craig-Likely, and Dominique, the courts found that the lender was not entitled to collect the sums that it had advanced for taxes and insurance. Each of those cases was predicated not just on a finding that the lender had failed to comply with § 2609(b) of RESPA. Rather, each of those cases specifically made a finding that the lender had "waived" its right to assert a claim for the arrearages in question. In Padgett, the record shows that there were multiple post-confirmation amendments to the confirmed plan, to which the lender did not object or assert a claim for the increases for taxes and insurance. In Craig-Likely and Dominique, the record shows that the debtors performed under their confirmed Chapter 13 plans for well over three years, during which time the lender failed to send notice of the increases in taxes and insurance that occurred post-confirmation.

-18-

The relevant question before the Court then is whether, under the facts and circumstances in this case, Washington Mutual has "waived" its right to collect the disputed arrearages for taxes and insurance. Under Michigan law, "[w]aiver is the intentional relinquishment of a known right. The usual manner of waiving a right is by acts which indicate an intention to relinquish it, or by so neglecting and failing to act as to induce a belief that it was the intention and purpose to waive." Bailey v. Jones, 219 N.W. 629, 630 (Mich. 1928) (citations omitted).[5]

The uncontroverted evidence in this case shows that Washington Mutual failed to give the Debtor notice of any escrow shortage or deficiency from 2002 until September 26, 2007 when it filed a proof of claim in this case. No evidence was adduced to show that Washington Mutual ever sent any such notice and the Debtor testified credibly that he never received any such notice. Moreover, during all of the years in question, the Debtor was in a pending Chapter 13 case in which a local bankruptcy rule specifically created a separate, independent duty on the part of Washington Mutual to send a notice of any increase in the Debtor's periodic payments under his Chapter 13 plan. The Debtor was very clear in his testimony that he made payments in the amount of $886, and believed that taxes and insurance were to be paid by Washington Mutual out of that amount. Five years of silence in these circumstances is sufficient to induce a belief on the part of the Debtor that he was paying exactly the right amount every month. The Debtor had no reason to personally pay taxes or insurance or to think Washington Mutual had advanced payments for them, and no knowledge of any "additional amount" he was supposed to pay. By failing to give notice, Washington Mutual induced a belief that it was Washington Mutual's intention and purpose not to request payment from the

---

[5] Paragraph 15 of the mortgage provides that the governing state law regarding the mortgage is the state in which the property is located. Here, that is Michigan.

Debtor for the amounts that it advanced for taxes and insurance.  Therefore, the Court concludes that in the facts and circumstances of this case, Washington Mutual has waived its right to now recover the disputed amount of the arrearage in its proof of claim.

There is one factual distinction between this case and the <u>Padgett</u>, <u>Dominique</u> and <u>Craig-Likely</u> cases that requires discussion.  The inaction on the part of the lenders in <u>Padgett</u>, <u>Dominique</u> and <u>Craig-Likely</u> occurred during the pendency of Chapter 13 cases that were still pending before the bankruptcy court.  Here, much of the inaction on the part of Washington Mutual took place during the Debtor's prior Chapter 13 case, which was dismissed almost a year ago.  However, the Court is not convinced that this distinction requires a different result.  The conclusion that the Court has reached in this case is based on the equitable doctrine of waiver.  The facts giving rise to the Debtor's defense of waiver occurred in a bankruptcy case.  The fact that the bankruptcy case has since been dismissed should not prevent the application of the principles of waiver to Washington Mutual's conduct during that bankruptcy case.  Waiver is an equitable doctrine.  In this case, it is not just Washington Mutual's failure to comply with RESPA by itself that provides the basis for the waiver.  Rather, the Court's conclusion is based on Washington Mutual's failure to comply with RESPA, combined with its failure to comply with LBR 3001-2, its failure to comply with the notification requirements of its mortgage, the lengthy passage of time, the Debtor's substantial performance of his plan from 2003-2007, and the Debtor's inability to now cure the surprise arrearage claim because he is on a fixed retirement income.  In these circumstances, the fact that the Debtor's first case was dismissed is outweighed by other relevant factors.

The final question to be addressed is the remedy to be imposed in this case.  By the time that the Court held the evidentiary hearing, the relief requested by the Debtor changed somewhat from

-20-

what he initially requested in his amended objection to the claim of Washington Mutual. Although the case law discussed above supports disallowing the taxes and insurance arrearage, the Debtor has displayed some ambivalence, and even a willingness to pay the arrearage, but over a long period of time that exceeds his plan. While still requesting disallowance, the Debtor's counsel suggested that the Debtor might pay all of the arrearage, albeit in two separate amounts to be paid over different periods of time. The first amount is the undisputed portion of the arrearage consisting of the unpaid arrearage from the Debtor's prior Chapter 13 case and the missed payments between when that case was dismissed and this current case was filed. The Debtor has calculated that to be $6,077. The Debtor proposed that he would cure that amount over 60 months through his Chapter 13 plan payments in this case. The second amount is the balance of the disputed arrearage for property taxes and insurance advanced by Washington Mutual. The Debtor's counsel proposed at the hearing that the Debtor might be able to amortize that arrearage over the life of the mortgage rather than treat it as arrearage to be cured under the Chapter 13 plan, even though the Debtor's objection requested disallowance of this amount of the arrearage.

Section 1322(b)(5) of the Bankruptcy Code allows a debtor to cure "any default within a reasonable time" for a claim "on which the last payment is due after the date on which the final payment under the plan is due." Washington Mutual's secured claim falls within § 1322(b)(5). The Debtor could point to no case law in support of a "reasonable time" extending after expiration of a Chapter 13 plan, indeed not even starting until after the expiration of the plan. The case law holds to the contrary. See United States v. Easley, 216 B.R. 543, 546 (W.D. Va. 1997) (reversing an order confirming a plan that provided for the cure of $3,000 of an $6,891.61 arrearage after completion of the plan, finding "[n]o plan [ ] may propose payments over a period of more than five years under any

circumstances"); <u>In re Scott</u>, 121 B.R. 605, 608-09 (Bankr. E.D. Okla. 1990) (denying confirmation of a 36-month plan with an eight-year cure period). In sum, Bankruptcy Code § 1322(d)(2)(C) does not permit confirmation of a plan that provides for payments over a period that is longer than 5 years. Therefore, the Court concludes that it does not have the authority to grant the Debtor's request to allow him to amortize the $14,137.34 balance of Washington Mutual's $20,214.34 arrearage claim after expiration of his Chapter 13 plan. However, because the evidence demonstrates the presence of all of the elements of waiver, and the law supports the disallowance of a claim where waiver is shown, the Court will sustain the Debtor's objection and disallow the arrearage portion of Washington Mutual's claim to the extent that it exceeds $6,077. The Court will enter a separate order consistent with this opinion.

For publication.

Signed on April 09, 2008

                                    /s/ Phillip J. Shefferly
                                    Phillip J. Shefferly
                                    United States Bankruptcy Judge